UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DANIEL TROMPETTA | : | NO.: 3:02CV00943 (MRK) |
| | : | |
| v. | : | |
| | : | |
| JAMES KING AND | : | |
| JOSEPH FECAROTTA | : | DECEMBER 3, 2003 |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR ATTORNEY'S FEES**

### I.  NATURE OF THE PROCEEDINGS

This case stemmed from an altercation between the plaintiff, then an off-duty Danbury police officer, and two civilians, Christopher Duffy and Russel Prevost, on August 25, 2001.  The two civilians were arrested at the scene.  The plaintiff was arrested two months later after an investigation was conducted.  Mr. Trompetta had arrested Mr. Prevost two days prior to this incident.

The plaintiff filed this civil rights action against fellow police officers James King and Joseph Fecarotta claiming violations of his First, Fourth and Fourteenth Amendment rights.  The plaintiff's action was brought pursuant to 42 U.S.C. §§ 1983 and 1988.  In essence, the plaintiff asserted that Detective Lieutenant King was liable because he failed to conduct a "more thorough" investigation and that Detective Lieutenant Fecarotta was liable because he "allowed" witnesses to give fabricated or exaggerated statements.  The plaintiff alleged that Detective Lieutenant Fecarotta was

motivated by a six-year-old vendetta, sparked by Mr. Trompetta's 1996 investigation of a friend of Mr. Fecarotta.

Detective Fecarotta was charged with conducting Internal Affairs investigations from August 25, 2001 through September 10, 2001 and he investigated the subject altercation. While Internal Affairs was investigating the matter, the criminal system was processing Mr. Prevost and Mr. Duffy and their attorney requested the contents of the Internal Affairs file. Assistant State's Attorney Walter Flanagan, upon reviewing these documents, concluded that probable cause existed to arrest Mr. Trompetta and asked Detective King, who had assumed Detective Fecarotta's responsibilities for Internal Affairs investigations, to draft a warrant application. On October 16, 2001, after reviewing the witness statements, Detective King signed an arrest warrant for the plaintiff. The warrant application was approved and signed by State's Attorney Walter Flanagan and Superior Court Judge James P. Ginocchio on October 17, 2001.

Each of the witnesses to the altercation described the plaintiff as the aggressor, and having, in fact, provoked or prolonged the altercation. Detective Fecarotta took each of the witness statements.

Witness Dawn Butler saw the plaintiff and Mr. Duffy fighting and Mr. Prevost attempt to stop the plaintiff from punching Mr. Duffy. Ms. Butler also tried to stop the fight. She saw the plaintiff punch Mr. Prevost in the face, and saw Mr. Prevost fall to the ground with a bloody nose.

Witness Colin Codner saw Christopher Duffy and the plaintiff in a fight.  Mr. Codner and Russell Prevost broke up the fight, and then Mr. Trompetta punched Mr. Prevost in the nose, causing blood to explode and Mr. Prevost fell to the ground.

Witness Josh Moskowitz saw the plaintiff and Mr. Duffy wrestling, and the plaintiff put Mr. Duffy in a headlock and begin punching him in the face.  Mr. Moskowitz got in between Mr. Duffy and the plaintiff.  Thereafter, the plaintiff punched Mr. Prevost in the face, causing him to fall.

Judith Kendrick saw the plaintiff walk toward his car, but then turn and ask Mr. Prevost how he liked sleeping in jail "in a nasty and sarcastic tone."  Mr. Prevost did not hear him, so the plaintiff repeated himself and walked back towards Mr. Prevost.  Mr. Prevost also replied with sarcasm that "it was great."  The plaintiff then leaned down into Mr. Prevost's face only an inch or so away and said that "maybe he should go back" to see how he would like "getting fucked in the ass."  Mr. Duffy replied that the plaintiff was a "big man now" and the plaintiff grabbed Mr. Duffy by the throat and pushed him back.  Ms. Kendrick tried to intervene, but the plaintiff hit Mr. Prevost with the butt of his palm.  Ms. Kendrick then called 911.

Molly Sochor heard the plaintiff ask Mr. Prevost how he would like to spend another night in jail, which started the physical altercation.

According to Russell Prevost, the plaintiff came towards him, leaned over him and asked him how jail was (apparently a reference to the plaintiff's prior arrest two days earlier of Mr. Prevost).  Mr. Prevost replied that it was "okay."  The plaintiff then

told Mr. Prevost that the next time he would send him to Bridgeport so he could get "fucked in the ass." Mr. Duffy responded by asking the plaintiff if he felt "like a big man." The plaintiff then pushed Mr. Duffy and punched Mr. Prevost in the nose with the butt of his hand and also began swinging at Mr. Prevost and Mr. Duffy. The plaintiff then began punching Mr. Prevost while Mr. Duffy tried to stop him. The plaintiff put Mr. Duffy in a headlock. Dawn [Butler] and Colin [Codner] grabbed Mr. Prevost and while they were holding him, the plaintiff punched Mr. Prevost in the face.

According to Christopher Duffy, the plaintiff came over to Mr. Prevost and asked him how he liked spending the night in jail. Mr. Prevost responded that it was "all right," to which the plaintiff replied, "Maybe next time I'll get you put in Bridgeport and you'll 'get fucked up the ass'." Mr. Duffy told the plaintiff he was a "big tough guy" and the plaintiff grabbed Mr. Duffy by the throat and pushed him back. The plaintiff then hit Mr. Prevost in the nose with the palm of his hand. Mr. Prevost hit the plaintiff in return and Mr. Duffy grabbed the plaintiff around the neck to pull him back and threatened him. The plaintiff broke free and hit him in the lip.

The plaintiff conceded that Detective King did not bear him any ill will, and in fact, regretted having sued him. In Mr. Trompetta's mind, Detective King "violated" his rights by failing to more fully analyze the motives of the affiant witnesses, and in fact, erred in arresting him. Mr. Trompetta conceded that he had a collegial relationship with Detective King; indeed Detective King convinced a distraught Mr. Trompetta not to resign the night he was arrested.

4

With regards to Detective King's knowledge of the plaintiff's prior investigation of Jeffrey Gwynne, the plaintiff responded:

> I don't know and I – honestly if he did know, I don't think it would have made a difference to him.

Conversely, the plaintiff claimed that Detective Fecarotta was upset with the plaintiff's 1996 investigation into Mr. Gwynne, who was apparently a friend. The investigation into Mr. Gwynne "just died." The plaintiff acknowledged that in the ensuing five and one-half years, Detective Fecarotta never disciplined or admonished him. Joseph Fecarotta is a defendant, according to plaintiff, because he "allowed these people knowingly to give information that was not true." According to Mr. Trompetta, this was in retaliation for his (Trompetta's) involvement in the Gwynne investigation, which plaintiff claims, constituted an exercise of his First Amendment rights.

## II.   THE DEFENDANTS SHOULD BE AWARDED ATTORNEY'S FEES

Since the passage of the Civil Rights Attorney's Fees Act of 1976, courts have the discretion to award reasonable attorney's fees to the "prevailing party." 42 U.S.C. §1988(b). Section 1988 provides that "the court, in its discretion, may allow the prevailing party … a reasonable attorneys' fee as part of the costs." Under this provision, fees are routinely awarded to a prevailing plaintiff who obtains some measure of relief, but not so readily available to a prevailing defendant. See e.g., Hughes v. Rowe, 449 U.S. 5, 14 (1980) (per curiam); Christianburg Garment Co. v. Equal Employment Opportunity Commission, 434 U.S. 422 (1978).

A prevailing defendant, unlike a prevailing plaintiff, "may receive fees under 42 U.S.C. § 1988 only when the Court finds that the action was frivolous, unreasonable, or groundless or that the plaintiff continued to litigate it after it clearly became so." Christianburg Garmet Co. v. Equal Employment Opportunity Commission, 434 U.S. 412, 422 (1978); Oliveri v. Thompson, 803 F.2d 1265, 1272 (2nd Cir. 1986). The court need not, however, conclude that the plaintiff acted in bad faith. See Christianburg, 434 U.S. at 418-19.

Accordingly, where the plaintiff's claims against the defendants James King and Joseph Fecarotta are found to be "groundless," the Court may award attorney's fees to the defendants.

On or about April 25, 3003, the defendants moved for summary judgment as to the plaintiff's Complaint in its entirety. On October 30, 2003, the Court (Kravitz, J.) granted the defendants' motion from the bench. The Court ruled that the defendants were entitled to qualified immunity and that the plaintiff failed to establish a violation of his Fourth Amendment rights as a matter of law.[1] At oral argument, the plaintiff, through counsel, conceded that this case involved a Fourth Amendment claim as opposed to a First Amendment claim and waived said claim. As set forth below, the plaintiff's claims were groundless and frivolous.

---

[1] A written memorandum of decision has not been issued. The defendants requested a copy of the transcript of the Court's decision from the bench on November 13, 2003, but the same has yet to be provided.

### A.  Defendant Fecarotta

#### 1.  Fourth Amendment Claim

It was undisputed that Detective Fecarotta's involvement in this case was limited to the investigatory phase.  The plaintiff's claim that Detective Fecarotta "allowed" witnesses to give statements that were, according to him, untrue, does not establish liability under the Fourth Amendment as a matter of law.  The Fourth Amendment provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

There is nothing in the Fourth Amendment addressing the parameters of an officer's investigation into an Internal Affairs complaint or the taking of witness statements.  The plaintiff's claim was frivolous on its face.  Further, in his memorandum in opposition to the motion for summary judgment, the plaintiff failed cite to *any* evidence that the witness statements did in fact contain numerous misrepresentations of fact.

Moreover, there was certainly no "clearly established" constitutional right requiring Detective Fecarotta to investigate and verify each and every statement by a witness or to censor those statements.  On the contrary, altering a witness' statement or pressuring a witness to testify differently would be improper.  In his memorandum in opposition to the motion for summary judgment, the plaintiff simply implied that his relationship with several of the witnesses established a bias on the part of the witnesses

against him. The plaintiff never contested that the witnesses actually gave the statements attached to the defendants' motion, nor did he contest that the statements, if true, would be sufficient to warrant a probable cause finding.

The law regarding qualified immunity was well-settled prior to the filing of the plaintiff's Complaint. An officer will be entitled to immunity unless: (i) he violated the plaintiff's rights; and (ii) those rights were clearly established at the time of the alleged violation. In this case, the plaintiff failed to establish even that his rights were violated. The witness statements supported probable cause, a judge signed the arrest warrant at issue and the plaintiff was in fact convicted of breach of peace.

### 2.    First Amendment Claim

The plaintiff's First Amendment claim against Detective Fecarotta was also frivolous and groundless. Indeed, at oral argument on the defendants' motion for summary judgment, the plaintiff conceded that his claim was a Fourth Amendment claim and waived his First Amendment claim. This fact alone is evidence of the frivolous and groundless nature of the plaintiff's First Amendment claim. Regrettably, the plaintiff failed to withdraw the claim before the defendant incurred costs in defending against it.

Further, as a matter of law, the plaintiff failed to establish any evidence to support his First Amendment claim. The claim that the plaintiff was retaliated against for his investigation into another officer's conduct *six years* earlier is not sufficient to establish a *prima facie* case of retaliation. The temporal proximity is absent. Further, there was no

allegation or evidence that Detective Fecarotta took any *action* against him or that his investigation violated procedure.

### B. Detective King

#### 1. Fourth Amendment

Detective King is the individual who applied for an arrest warrant against the plaintiff. As such, the Fourth Amendment could have applied if there had been any evidence of wrongful conduct. There was none. The plaintiff conceded that Detective King did not bear him any ill will, and in fact, regretted having sued him. In the plaintiff's mind, Detective King "violated" his rights by failing to more fully analyze the motives of the affiant witnesses, and in fact, erred in arresting him. This claim was groundless. As set forth above, the statements gave rise to probable cause and there was no dispute that the statements were given. Further, a judge signed the warrant and the plaintiff was in fact convicted of breach of peace. The plaintiff did not present any evidence that Detective King failed to follow proper procedures.

Further, there was no basis for the plaintiff's claim against Detective King in light of the defense of qualified immunity.

#### 2. First Amendment

If possible, the plaintiff's First Amendment claim against Detective King was even more frivolous than his claim against Fecarotta. With regards to Detective King's knowledge of the plaintiff's prior investigation of Jeffrey Gwynne, the plaintiff responded:

9

> I don't know and I – honestly if he did know, I don't think it would have made a difference to him.

As such, there was no basis for the plaintiff to believe that Detective King's motivations were retaliatory. Further, as mentioned above, the extended period of time between the alleged protected conduct and the application for an arrest warrant did not suffice to establish a *prima facie* case of retaliation. There was no inference of retaliation to be made. Additionally, the plaintiff's waiver of this claim at oral argument is indicative of the groundless nature of the claim.

### III. DEFENDANTS' FEE REQUEST IS REASONABLE

In awarding attorney's fees pursuant to §1988, the court must determine a "lodestar" figure. See Gierlinger v. Gleason, 160 F.3d 858, 876 (2nd Cir. 1998). Such figure is arrived at by multiplying "the number of hours reasonably expended on the litigation … by a reasonable hourly rate." Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933 (1983). In considering whether the hourly rate is reasonable, the court should consider the hourly rates prevailing in the community for the services of lawyers of comparable skill, experience and reputation. "The award may be based in part on knowledge of hourly rates charged in a community and is not limited to the submitted evidence." Otero v. Housing Authority of Bridgeport, No. 3:98CV1935 (PCD) (attached as **Exhibit A**), citing, Miele v. N.Y. State Teamsters Conf. Pension & Ret. Fund, 831 F.2d 407, 409 (2nd Cir. 1987). In considering whether the requested hours are reasonable, the court should consider whether the hours are supported by

contemporaneous time records, and after reviewing such records may exclude hours that are duplicative or excessive.

     The defendants seek to have Attorney Rose, a partner, compensated for his time at a rate of $115.00 per hour and Attorneys Shaw and Powell compensated for their time at a rate of $100.00 per hour.  These fees are very reasonable for attorneys with comparable experience in the community.  See Tsombandis v. City of West Haven, 208 F. Supp.2d 263 (D. Conn. 2002).  In Tsombandis, the court noted that the following rates had been found reasonable: $300 and $250 for partners in a §1983 case; $275/hour for an attorney with 20 years of experience; $200/hour for an attorney with eight years of general experience; $175/hour for associates with three and four years of experience; $200/hour for a partner; and $150, 135, $130, $125 and $100 for associates.  See id. at 275-766.

     Attorney Rose requests a fee award for 98.7 hours.  Attorney Powell requests a fee award for 25.9 hours.  Attorney Shaw requests a fee award for 24.5 hours.  These hours were all spent providing legal services to the defendants in the defense of this action.  See Invoices, attached as **Exhibit B**.

## IV. CONCLUSION

For the foregoing reasons, the defendants, James King and Joseph Fecarotta, should be awarded attorney's fees in the amount of $16,390.50.

DEFENDANTS,
JAMES KING AND
JOSEPH FECAROTTA

By _____
Alexandria L. Voccio
ct21792
Howd & Ludorf
65 Wethersfield Avenue
Hartford, CT  06114
(860) 249-1361
(860) 249-7665 (Fax)
E-mail: avoccio@hl-law.com

## CERTIFICATION

This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. mail to the following counsel of record this 3rd day of December, 2003.

Norman A. Pattis, Esquire
Williams and Pattis, LLC
51 Elm Street, Suite 409
New Haven, CT  06510

_____
Alexandria L. Voccio